TED W. CASSMAN (SBN 98932)
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, California 94710
(510) 845-3000

Attorneys for Defendant
MEHDI MATTEO RASHIDI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | NO. CR 05-00744 MJJ |
| Plaintiff, | DEFENDANT'S SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE REPORT |
| vs. | |
| MEHDI MATTEO RASHIDI, | Date: May 25, 2006 |
| Defendant. | Time: 2:00 p.m. |
| | Court: Hon. Martin Jenkins |

## INTRODUCTION

Defendant Mehdi Matteo "Matt" RASHIDI has pleaded guilty to a single count of theft of trade secrets in violation of 18 U.S.C. § 1832(a)(1), pursuant to a Rule 11(c)(1)(C) plea agreement that calls for a Total Offense Level of 10. The probation department agrees with that conclusion, finds that the applicable sentencing range is 6 to 12 months and recommends a sentence of 7 months home detention. We understand that the government's position is that the sentence should include 30 days jail. For all of the reasons set forth below, we believe that the minimal sentence is appropriate and ask the Court to impose probation with six months of home detention.

# MATT'S PERSONAL HISTORY

Matt Rashidi is 45 years old, has no criminal history and is married with two very young daughters. Born in Iran, raised in a fine supportive family, Matt is a brilliant, hard-working, and an accomplished engineer and scientist with a long history of honest, exceptional work. Having lost close family members to cancer at an early age, Matt has had a life long dream of helping fight disease and of bringing relief to those afflicted by it. To those who know Matt, it is simply impossible that he has been convicted of any crime.[1] Yet here he is.

Matt came to this country with his older sister in 1978, shortly after the Shah of Iran from fell power. Only 17 years old at the time, Matt finished high school and then went to Junior College, both in the Los Angeles area. Extremely bright, Matt was an excellent student. After three semesters, Matt transferred to California State University of Long Beach. He graduated with honors in 1984 with honors and a degree in chemical engineering. In 1989, Matt obtained his PhD in chemical engineering from the University of California at Santa Barbara. Over the next eight years Matt excelled at several different positions in his field, including management positions for large projects undertaken by the University of California at Santa Barbara and the U.S. Department of Energy Lawrence Livermore Laboratory. During this time, Matt earned a now well-established reputation as a quiet, hard-working, and inspired engineer. (See letters of support, as well as Awards, Honors and Recognitions, appended to PSR.)

Throughout all of these years and up to the present day, Matt has consistently been a pillar of support for every member of his family, including especially

---

[1] We presented probation with more than 35 character reference letters from family, friends and former colleagues attesting to Matt's fine moral character, to the devastating impact his offense has had on Matt and his family, and to Matt's willingness to accept his responsibility for his misconduct. Because copies of these letters were appended to PSR, we will refer to them throughout this memorandum without appending them to this pleading.

his elderly parents who have endured many illnesses. In 1999, Matt married Nazarin. They now have a daughter aged almost two and a son aged six months.

Before marrying Nazarin, in 1998, Matt took a position at BioGenex as Director of Medical Imaging and Diagnostics Systems. As demonstrated by the numerous letters submitted, BioGenex has a well-deserved reputation as a singularly dysfunctional place to work; and the owner/director, Kris Kalra, has an equally well established record as tyrannical, vindictive and vengeful.[2] As a result, there was a constant and steady turnover of personnel at BioGenex. In fact, Matt was one of the few engineers who was secure enough and well possessed enough to put up with Kalra. Matt stayed and worked for Kalra for 5 ½ years.

During 2004, Matt suffered a string of severe setbacks in both his professional and personal life. In late 2003, Matt worked out a deal with Kalra which called for Matt to receive a commission on the sale of any Vision System. Kalra reneged on the deal. During 2004, four members of Matt's division at BioGenex either quit or were fired. This left Matt overwhelmed with work. In February, Matt and his wife (then 6 months pregnant) were in a serious car accident. There was concern for the baby, nightmares and trauma. Then, in April, the baby was born 5 weeks prematurely. This caused added concern, sleep deprivation and stress, and when Matt asked Kalra for sick leave, he said no. So Matt was still in an avalanche of work.

Matters continued to deteriorate. In June, Matt's mother was diagnosed with breast cancer. Because Matt was knowledgeable in the field, his family depended on him to take her to her appointments at UCSF and to see to her care. Also in June, Matt broke his toe, a condition that went undiagnosed for several weeks and was the

---

[2] With regard to the prevailing hostile and dysfunctional environment at BioGenex, we refer the Court to the declaration of Alexander Ryncarz II, and to the letters of Getachew Sequar, Ph.D., David A. Sanan, Ph.D., Bill Mitchell, James Kathrein, and Patricia Nevares.

cause of great discomfort. By August, Kalra was still demanding a huge commitment of work from Matt (who by now was the sole remaining member of what had been a five member department) while at the same time refusing to pay commissions owed, refusing to reimburse travel expenses he had previously agreed to, and holding up Matt's employee evaluation (thereby delaying an earned raise.)

## THE OFFENSE

It was in this oppressive atmosphere that Matt made the unfortunate decisions that he did as he was preparing to leave BioGenex. On the very afternoon that Matt informed Kalra of his decision to depart, Matt took a set of original engineering notes belonging to Matt's former co-worker, Wallace Chang. Motivated by rage against Kalra's slights and injustices, suffering from distress, over-work, sleep deprivation, confusion or a combination of all these factors, Matt actions when leaving BioGenex were strikingly inconsistent with his character, reputation, record and life-long history of honesty, integrity and accomplishment. The fact that Matt departed from BioGenex with a co-worker's original engineering notes, an item whose absence could not possibly go unnoticed, further underscores that Matt was not thinking clearly. It is no overstatement to say that the mistakes Matt made in August 2004 are of tragic proportions for Matt and his family.

Matt has pleaded guilty to his offense, consisting of the theft of the engineering notes belonging to his former co-worker, Wallace Chang. The plea agreement assigns a value of $66,000 to the notes, which is Chang's entire annual salary. As was evident at the time Matt entered his plea, it is excruciatingly difficult for Matt, a man who prides himself on his established record and reputation for honesty, to accept responsibility for his misconduct. Yet, as reflected in the PSR, he has done that by word and by deed.

//

4

## BIOGENEX' LOSS CLAIMS

At the time of Matt's arrest, BioGenex employees made several misrepresentations to the police. First, they told the police that Matt had no right to access the Engineering Building where Chang kept his notes when, in fact, Matt had a key card that the police took into evidence and frequently entered the building as a routine part of his job. Second, they told the police that Matt had not been working on the i4000 project when, in fact, Matt had been expressly asked to work on design aspects of the project and had made his own engineering drawings for the project. These notes, in Matt's handwriting, were seized by police from his home in a neat binder labeled, i4000. That binder, located next to several other binders for projects on which Matt was working, also contained a copies of the i4000 operating manual and of the i4000 patent disclosure. Contrary to BioGenex' current assertions, Matt possessed both of those documents legitimately.

In its most recent submission to probation, BioGenex continues to make inaccurate and exaggerated claims concerning the nature and value of the i4000 technology, the nature and extent of Matt's misconduct, and the impact of that misconduct on BioGenex and BioGenex' personnel. For example, BioGenex asserts:

-- that "[t]he i6000 system is an unprecedented All-in-One, All-At-Once consolidated workstation meaning that it can process multiple slides at the same time with different reagents looking for different diseases." (PSR, ¶ 20.)

– that Biogenex' next generation imager, the i4000, ... contains many improvements over the i6000 system, among them, enabling the independent control of stained slides with short duration temperature treatment (necessary for improved analysis) "coverslipping" or the automated covering of a slide once the reagent has been provided." (PSR, ¶ 20.)

– that BioGenex "stood to make many millions of dollars from [the i4000's]

development and sale." (PSR, ¶ 7.)

— that as a result of Matt's conduct the "launch of the Xmatrx System has been delayed by at least two months" and "BioGenex has been exposed to a commercial risk that a third party can possibly reverse engineer or outright copy our automated system without spending the considerable amount of research and development that was invested by BioGenex to date." (PSR, ¶ 20.)

— that Matt stole or misappropriated numerous other items, in addition to Chang's engineering notes. (PSR, ¶¶ 8-11.)

— that Matt's conduct "destroyed the trust and close bonds that are common in small, entrepreneurial company's [sic] like mine." (PSR, ¶ 20.)

These claims are overblown, if not fanciful. As noted above, BioGenex was not a company with established trust and close bonds among the employees. To the contrary, the pervasive atmosphere was one of hostility and paranoia. This led to a consistently rapid turnover of employees which further undermined trust and security among personnel. Indeed, during the months leading up to Matt's resignation, four other employees left his department at BioGenex, causing Matt to be overwhelmed with additional work at a time when he was suffering severe demands and setbacks in his personal life.

Even more clearly, BioGenex' assertions of significant delays and potential losses are false. As explained in the accompanying letter from Ron Zeheb, Ph.D., current Director of Diagnostic Molecular Pathology at the Lahey Clinic and previously employed as an engineer at both Ventana Medical Systems and DakoCytomation (previously CytoLogix), BioGenex cannot reasonably anticipate millions of dollars in sales from its marketing of the i4000. Contrary to BioGenex' assertions, the technology is not a significant development in the industry and may well be preclude by patents already obtained by competitors. Additionally, far from

unprecedented or cutting edge, several competitors have for many years marketed autostainers featuring that same technology. (See letter and resume of Ron Zeheb, Ph.D., appended as Exhibit A.)

Accordingly, BioGenex' loss claims should be rejected by the Court.

## ARGUMENT

As noted above, the parties and probation agree that the offense level is six to twelve months. As a Class felony with an offense level in Zone B, Matt would be eligible for a probationary even if the Guidelines were still mandatory. U.S.S.G. § 5C1.1(c). (PSR, ¶ 74, 77.) But of course, the Guidelines are now advisory.

In a sentence post-*United States v. Booker*, 543 U.S. 220 (2005), the court is to calculate the Guidelines, as we have done above, consider downward departures either authorized or allowed under the Guidelines, and then apply the factors enumerated in 18 USC 3553(a). Several district courts have already suggested a process for analysis and one in particular has provided a framework for sentencing in the realm of "advisory Guidelines." In *United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005), Judge Adelman stated:

> I determined that the factors set forth in § 3553(a) fell into three general categories: the nature of the offense, the history and character of the defendant, and the needs of the public and the victims of the offense. I analyzed each category and in so doing considered the specific statutory factors under § 3553(a), including the advisory guidelines.

Tying the court's analysis to the factors outlined in § 3553(a) enables appropriate review of the sentence.

We are satisfied that the Guideline calculations are consistent with the plea agreement and do not request any adjustment or departure. However, we would note that were this not a Rule 11(c)(1)(C) plea, I would be urging several grounds for downward departure, especially aberrant behavior. U.S.S.G. § 5K2.20, which provides

as follows:

> A sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior. However, the court may not depart below the guideline range on this basis if (1) the offense involved serious bodily injury or death; (2) the defendant discharged a firearm or otherwise used a firearm or a dangerous weapon; (3) the instant offense of conviction is a serious drug trafficking offense; (4) the defendant has more than one criminal history point, as determined under Chapter Four (criminal History and Criminal Livelihood); or (5) the defendant has a prior federal, or state, felony conviction, regardless of whether the conviction is countable under Chapter Four.

Application Note 1 states that "Aberrant behavior" means a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." This text was amended effective November, 2000, to resolve a circuit split on the issue of whether, for the purpose of a downward departure, a "single act of aberrant behavior" (pre-amendment) could include multiple acts occurring over a period of time. As the Commission explained:

> This amendment addresses the circuit conflict but does not adopt *in toto* either the majority or minority circuit view on this issue. As a threshold matter, this amendment provides that the departure is available only in an extraordinary case. However, the amendment defines and described "aberrant behavior" more flexibly than the interpretation of existing guideline language followed by the majority of circuits that have allowed a departure for aberrant behavior only in a case involving a single act that was spontaneous and seemingly thoughtless. The Commission concluded that this application of the current language in Chapter One is overly restrictive and may preclude departures for aberrant behavior in circumstances in which such a departure might be warranted. For this reason, the Commission attempted to slightly relax the "single act" rule in some respects, and provide guidance and limitations regarding what can be considered aberrant behavior. At the same time, the Commission also chose not to adopt the "totality of circumstances" approach endorsed by the minority circuits, concluding that the latter approach is overly broad and vague. The Commission anticipates that this

compromise amendment will not broadly expand departures for aberrant behavior.

Appendix C, Amendment 603. The Commission intended that the new language, including "single criminal occurrence" and "single criminal transaction" "will be *somewhat broader than "single act"*, but will be *limited in potential applicability to offenses (1) committed without significant planning; (2) of limited duration; and (3) that represent a marked deviation by the defendant from an otherwise law-abiding life*. For offense conduct to be considered for departure as aberrant behavior, the offense conduct must, at a minimum, have these characteristics." *Id.*, (emphasis added).

Given all of the circumstances, including Matt's accomplishments and reputation for honesty and integrity, his life-long commitment to science, helping others and improving human health, his previously unblemished record, and his genuine remorse and acceptance of responsibility, we submit that the appropriate sentence should be three years probation, six months home detention, a $6,000 fine, and $100 special assessment.

## CONCLUSION

.

Dated: May 18, 2006              ARGUEDAS, CASSMAN & HEADLEY, LLP


_____
TED W. CASSMAN, attorneys for
Defendant Mehdi Matteo RASHIDI

# PROOF OF SERVICE

I am a citizen of the United States. I am over the age of 18 and not a party to the within action; my business address is 5900 Hollis Street, Suite N, Emeryville, California 94608.

On May 19, 2006, I caused to be filed and served a copy of: SENTENCING MEMORANDUM on the following person(s) by placing a true copy thereof enclosed in a sealed envelope and having mailed and/or faxed the same on the following parties:

Mark Krotoski
Asst. U.S. Attorney
450 Golden Gate Avenue
San Francisco, CA 94102
FAX: (415) 436-7234

I certify or declare under penalty of perjury that the foregoing is true and correct.

Executed on May 19, 2006, at Emeryville, California.

_____
Linda Stiglich

# EXHIBIT A

May 19, 2006

The Honorable Martin Jenkins
c/o Ted Cassman
803 Hearst Avenue
Berkeley, CA 94710

Your Honor:

For much of my professional career I have managed, at the Director or Vice President of R&D level, the design, development and commercialization of instrument systems that are used for the automated staining of tissue specimens mounted on microscope slides. (A copy of my resume is attached.) Staining includes: immunohistochemical (IHC), histochemical special stains (special stains), and *in situ* hybridization (ISH/FISH) procedures. In general terms, Biogenex Corporation's Xmatrx instrument would be considered similar in purpose and function to devices whose development I have managed. I am currently Director of Diagnostic Molecular Pathology at the Lahey Clinic, a premier tertiary care facility located in Massachusetts. Part of my responsibilities at Lahey includes management of their clinical histology laboratory. The laboratory processes tissue on microscope slides in order to help render diagnoses of medical conditions, and utilizes a number of instruments in order to accomplish this task. These instruments include two automated staining systems (Dako Corporation's Autostainer for use in IHC procedures and their Artisan stainer for use in special stains), as well as automatic coverslippers (Sakura Corporation's Tek-Mate) and others. On the basis of my experience both as a developer and a user of these devices I would like to comment on a number of issues that might assist the Court in establishing the significance/value of the items in question.

I have not met, nor do I know Dr. Rashidi. Nor have I been retained as an expert (or received any compensation of any kind) relating to his pending criminal case. I write this letter in an attempt to provide the Court with information and opinions that I believe are objective and correct.

I have been asked to address the following questions:

1. Whether the loss of an engineer's original printed hard-copy notes and/or a CD containing "custom software, design schematics, and technical information" would significantly delay a company's research and development?
2. Whether the development of a new generation autostainer with the capacity for independent short duration temperature control for slides, combined with automated cover-slipping, would constitute a significant technological development in the industry?

3. Whether there is a likelihood that a company developing such an instrument could expect millions of dollars in sales?

Removal and/or loss of a hard-copy of engineering drawings and a CD containing technical information.

During the 10+ years that I have managed instrument development, engineering design was always conducted using a computer and one or another of several available computer aided design (CAD) programs (e.g., Pro/Engineer, PTC Corporation, Needham, MA, SolidWorks, SolidWorks Corp., Concord, MA). Engineering drawings, diagrams, etc., were stored as files on the computer and backed up periodically to ensure data integrity. From time to time such files might have been printed out (hard copy) for various purposes. For example, one might print out an engineering drawing to expedite peer review in a group setting, to provide assembly instructions in a manufacturing setting or to create a hard copy back-up. The loss of such hard copy documents would likely generate questions about the circumstances of the loss; however, recovery of the lost document would be as simple as printing out another copy from the electronic file. It is unlikely in the extreme that the mere removal of a paper copy of an engineering drawing, by virtue of its removal or destruction alone, would result in any significant consequence or loss to its owner.

For similar reasons, the loss of a CD containing technical information would be unlikely to entail a loss of critical data or information not maintained elsewhere on a company's computers. I am informed that BioGenex does not expressly claim otherwise.

Processing multiple slides at the same time with different reagents looking for different diseases.

This concept is not new. Automated slide staining systems capable of processing multiple slides simultaneously have been commercially available at least since 1991/1992 with the launch of the Ventana Medical Systems Model 360 automated stainer (which itself was pre-dated by an automated stainer from the now defunct Biotech Corporation). The Ventana 360 utilized different reagents while processing multiple slides at the same time to help identify different diseases. In addition, automated slide staining systems capable of processing multiple slides simultaneously using different reagents to identify different pathological conditions at the same time have also been available from CytoLogix Corporation since about 1998 (the CytoLogix Artisan, now owned by Dako Corporation), from Dako Corporation (the Dako Autostainer), and others. Clearly the notion of processing multiple slides simultaneously does not constitute an inventive break-through or trade secret of Biogenex.

"Independent control of stained slides with short duration temperature treatment."

CytoLogix Corporation invented and patented independent slide heating. Its product (the Artisan slide stainer) utilized this technology and was commercialized, as stated above, in about 1998. One of the features of the Artisan was (and remains) the ability to specify various temperatures and incubation durations on different slides simultaneously in order to optimize the quality of the stained slides. Very short duration times (as little as 1 second) may be specified as required. In practice, however,

incubation times shorter than about 30 seconds to 1 minute would be uncommon for the vast majority of IHC, special stains, or ISH/FISH procedures utilized for research and clinical histological applications. So, the notion of "independent control of stained slides with short duration temperature treatment" has been publicly disclosed for many years.

Automated coverslipping.

Once slides have been processed, the stained tissue is preserved and prepared for viewing by the application of a thin glass or plastic strip (called a coverslip) that "sandwiches" the tissue between the coverslip and the glass microscope slide. Application of the coverslip may be done manually or with the aide of an automatic coverslipper of which there are several commercially available types. Most (if not all) labs that process a sufficiently high volume of slides to require the use of automated staining equipment, also use automated coverslippers for their labor saving convenience and speed. In my lab we use the Sakura Tissue-Tek coverslipper, which for convenience's sake, is physically located about 4 feet from the Artisan stainer. The Tissue-Tek has been commercially available for 10-15 years. In my view, the decision to incorporate the functionality of automated coverslipping within the same physical device that performs automated slide staining is first of all a marketing decision (is this what the customers really want and will they be willing to pay a premium for it?) and secondly an engineering decision (complexity, reliability, cost?). It is not an inventive leap. These two devices have been used side by side by both manufacturers and their customers (hospital laboratories such as mine, reference laboratories, etc.) for more than a decade. Awareness of the possibility of merging the two functions into one "box" has been around for just as long.

In conclusion, it is my opinion based upon my knowledge of the industry that the type of instrument described (an auto-stainer with individually heated slides and automated coverslipping would not constitute a significant advancement in the technology currently available in the marketplace. Furthermore, some or all of the technology may well be covered by patents already obtained by Ventana, CytoLogix, Dako, Sakura, Leica and others. In these circumstances, it is my opinion that the developer of such an instrument could not reasonably anticipate millions of dollars in sales.

Respectfully,

Ron Zeheb, Ph.D.

# RON ZEHEB, Ph.D.
134 Rosemont Dr., N. Andover, MA 01845
978-681-8028 (Home); 617-470-0502 (Cell)
rzeheb@yahoo.com

## Summary of Qualifications
- Proven **leadership** and **communication** skills with the ability to supervise, mentor and motivate.
- Ability to implement and **manage multiple projects** in a timely and cost effective manner.
- **Strategic thinker** who can also delve into project details and provide novel approaches to problem solving without losing sight of the big picture.
- Able to bridge multiple disciplines leading to effective and efficient **product development**.
- **15 year track record** of successfully developing and launching medical diagnostic products.

## Professional Experience

**4/4/05 – P**  The Lahey Clinic, 41 Mall Rd., Burlington, MA.
**Director, Diagnostic Molecular Pathology**
Provide cutting-edge diagnostics, raise Clinic's local and national profile in molecular testing, enhance patient care and augment revenue. Manage 20 person histology and cytology laboratories.

**9/17/02 – 7/1/04**  DakoCytomation Corporation, Cambridge, MA.
**Senior Vice President, Research & Development and General Manager** (Mar/03)
Manage all R&D activities in the US. Provide strategic and operational leadership to staff of 100+ scientists, engineers and laboratory associates at three facilities in California, Colorado and Massachusetts. Formulate global corporate R&D policy and long-term strategic direction focused on the development of research and diagnostic systems (instruments, software and reagents; more than 2000 products) for immunohistochemistry, histochemistry, *in situ* hybridization and flow cytometry. Operating budget in excess of $15 MM. General management responsibilities for the Cambridge, Massachusetts facility.

**Vice President, Research & Development and General Manager** (Oct/02 to Mar/03)
Promoted to General Manager with responsibility for all operations including R&D, Engineering, Manufacturing, Finance, Customer Service/Training and Administration when DakoCytomation, a global corporation with headquarters in Denmark and US facilities in California and Colorado, acquired the operations and assets of CytoLogix Corporation in September, 2002.

**8/1997 – 9/2002**  CytoLogix Corporation, 99 Erie St., Cambridge, MA.
**Vice President, Product Development & Engineering** (Sep/99 to Sep/02)
Managed design, development, feature enhancements, and performance improvements, with an operating budget of $4.0 MM and an organization of 20+ scientists, mechanical, software, and plastics engineers, research associates, technicians, and consultants, representing approximately one third of the company's resources. Accomplishments:
- Developed and launched all revenue-generating products for start-up company including Artisan™ Automated Slide Staining system and over 50 separate staining kits.
- Launched major system enhancements, doubling performance and leading to significant increase in adoption rates.
- Helped provide liquidity to investors through negotiation of the sale of CytoLogix's assets, including the Artisan staining system, to DakoCytomation Corporation.

- Significantly increased value, to CytoLogix's shareholders, of DakoCytomation's asset purchase by achieving development milestones by the most aggressive target date thus maximizing the dollar value of the acquisition.

**Director of Research & Development.** (Aug/97 to Sep/99)
First full-time employee hired after CEO for start-up medical diagnostics company. Set product development direction, priorities, and timelines. Managed development of histological special stains and immunohistologic reagent product line for use on automated slide-staining platform. Provided direction to engineering group, managed regulatory and safety requirements. Helped establish corporate culture, new business development, and strategic planning. Accomplishments:
- Established and staffed Product Development laboratory from scratch
- Recruited top-quality staff including scientists, engineers, safety and regulatory personnel
- Established instrument design specifications
- Identified and developed initial menu of 10 stain kits
- Helped design new corporate facilities

12/1992 – 8/1997  Ventana Medical Systems, Inc., Tucson, AZ.
**Director of Research & Development** (1994). Reporting directly to the CEO; managed R&D, business development, strategic planning, budgets and intellectual property estate. Represented Company to external investors, and participated at Board-of-Directors meetings.

**Senior R&D Scientist** (1992). Managed team of engineers, biochemists and technicians in the design, development and manufacturing of instrumentation and chemistries for automation of *in situ* hybridization and immunohistochemical assays. Designed innovative mechanical systems. Developed immuno- and DNA probe based assays under GMP guidelines. Developed marketing and sales strategies, pursued new business development opportunities. Oversaw training of customer service, sales and field service personnel.

1989-92  Oncogene Science, Inc., Uniondale, NY.
**Project Manager**; Division of Research Products and Diagnostics (1991). Managed four research associates in the development of immunoassays for basic/clinical research and cancer diagnostics. Facilitated the transfer of new products from R&D to manufacturing, performed market research, developed marketing strategies and provided customer support.

**Senior Scientist**; Division of Research Products and Diagnostics (1989). Initiated and developed a new product line of quantitative immunoassays to growth factors, oncogene and anti-oncogene encoded proteins resulting in the commercialization of the Company's first four assay kits.

# Additional Professional Experience

1985-89  University of Michigan, Ann Arbor, MI.
**Assistant Research Scientist**; Departments of Human Genetics and Internal Medicine (1988). Researched the hormonal control of transcriptional and post-transcriptional regulation of plasminogen activator inhibitor-1 using molecular techniques including cloning, sequencing and library construction. Supervised students and technicians. Independently funded.

        **Investigator**; Departments of Human Genetics and Internal Medicine (joint appointment, 1985). Independently funded, molecular study of the regulation of blood clot dissolving proteins. Supervised students and technicians.

1978-85      <u>Albert Einstein College of Medicine</u>, Bronx, NY.
        **Postdoctoral Fellow**; Department of Molecular Pharmacology (1983). Biochemical and immunological characterization of multidrug resistance including the raising and purification of monoclonal and polyclonal antibodies to p-glycoprotein.

        **Doctoral dissertation**; Department of Molecular Pharmacology (1978-1983). Cell-surface protein modifications accompanying the functional maturation of mammalian spermatozoa. Development and application of both routine and novel protein purification, characterization, and analytical methodology. Novel techniques included synthesis and cell-surface labeling with 2-iminobiotin, whose pH dependent affinity to avidin allows for reversible column purification of labeled proteins.

1976-78      <u>St. Vincent's Hospital</u>, NY, NY.
        **Research Associate**; Department of Rheumatology. Investigated the immunological and neurological basis of amyotrophic lateral sclerosis.

# Education
    1983    Ph.D. Biochemistry, Albert Einstein College of Medicine, Bronx, NY
    1976    M.S. Immunology, Rutgers University, New Brunswick, NJ
    1973    B.S. Zoology, Rutgers University, New Brunswick, NJ

# Continuing Education
    1995    Patent Law for Managers, Engineers and Scientists; The Center for Professional Advancement, East Brunswick, NJ
    1995    GMPs in Medical Product Development; Univ. of Wisconsin - Madison
    1993    Face to Face; The Forum Corporation
              Cycle Time Management; CTM Inc.
    1992    Conducting Employee Performance Evaluations; Padgett/Thompson
              Interviewing People; Padgett/Thompson
    1991    Improving Managerial Skills; American Management Association

# Awards and Fellowships
    2000        President's Leadership Award, CytoLogix Corp.
    1992-93   NIH SBIR Phase I Award
    1988-89   American Heart Association Research Grant
    1987-89   University of Michigan GI Award
    1986-87   American Cancer Society Award
    1985-87   NRSA Postdoctoral Award
    1978-82   NIH Graduate Fellowship

## Patents

Reynolds, F.H., Zeheb, R., Stephenson, J.R., and Sorvillo, J.M.: "Immunoassay for detection of mutant p53 polypeptide in serum." US 6083709 (issued, July 4, 2000).

Reynolds, F.H., Stephenson, J.R., Zeheb, R., and Sorvillo, J.M.: "Immunoassay for detection of mutant p53 polypeptide in biological fluids." EP1006364 (issued June 7, 2000), AU1370592 and WO9213970 (issued August 20, 1992).

Zeheb, R. and Rodgers, P.M.: "High temperature evaporation inhibitor liquid." US 5552087, EPO731775, WO9513987, JP9506291T, CA2176123 (issued, September 3, 1996).

Zeheb, R. and Rodgers, P.M.: "High temperature evaporation inhibitor liquid." US 5549848 (issued, August 27, 1996).

## Professional Affiliations

American Association for the Advancement of Science, American Chemical Society.